UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELAVAL INC.,

           Plaintiff,                          Civil Action No. 20-cv-13058
                                                      HON. BERNARD A. FRIEDMAN

vs.

HARDY'S HOLSTEINS, LLC

           Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT

I.     Introduction

DeLaval, Inc. commenced this diversity breach of contract action against Hardy's Holsteins, LLC for refusing to make payments on dairy equipment and supplies tendered under a series of agreements.

Before the Court are the parties' cross-motions for summary judgment. (ECF Nos. 56-57). Both sides filed their respective responses, replies, and sur-replies. (ECF Nos. 59-63, 65). The Court will decide the cross-motions without oral argument pursuant to E.D. Mich. 7.1(f)(2). For the following reasons, the Court will grant the cross-motions in part and deny them in part.

II.    Background

     A.    Factual History

1.   The Sales Agreement

DeLaval, Inc. ("DeLaval") is an Illinois corporation that sells equipment and supplies for milking dairy cows. (ECF No. 5, PageID.33-34).  Hardy's Holsteins, LLC ("Hardy") is a Michigan-based dairy farm. (*Id.*, PageID.34).

On June 1, 2018, Hardy executed a "Sales Agreement" with DeLaval to purchase a voluntary milking system that included four "VMS Classic" robotic milkers and four "V300" robotic milkers.[1] (ECF No. 5-2, PageID.43-46).   The parties later amended the Sales Agreement in November 2018 to substitute the purchase of two VMS Classics with two V300s and modified the pricing and payment terms. (ECF No. 5-3, PageID.49).   The parties later amended the Sales Agreement on two separate occasions, in March and September 2019. (ECF Nos. 5-4, 5-5).  The "Third Amendment" to the Sales Agreement revised the payments for the last two V300s in the following manner:

- Hardy would pay $187,950 "upon the setting" of the units; and

- pay the remaining $187,950 within seven days of the units "being installed, commissioned and operating (milk and wash) to industry standards ('Performance Standard')."

(ECF No. 5-5, PageID.54).

---

[1] The Sales Agreement refers to the V300s as "VMS new style." (ECF No. 5-2, PageID.46).

2

In the event Hardy disputed whether the last two V300s met the "Performance Standard," DeLaval agreed to:

- "schedule an independent inspection by a member of its North American VMS Technical Team . . . as soon as possible"; and

- "repair or replace any defective equipment, or make any other corrections needed, until it is able to certify that the Performance Standard has been met."

(*Id.*).  Hardy committed to paying the last $187,950 installment within five days after DeLaval's certification. (*Id.*).

The parties' arrangement unraveled in February 2020, when Hardy refused to pay the remaining $187,950, claiming that the V300s failed to satisfy the "Performance Standard." (ECF 56-2, PageID.1690, ¶ 11a.; ECF No. 57, PageID.2181).  Hardy never paid the last installment. (ECF No. 7, PageID.66, ¶¶ 16-17; ECF No. 56-2, PageID.1690, ¶ 11a.).

### 2.    The VMS Customer Assurance Program

Coincident with its execution of the Sales Agreement, Hardy enrolled in DeLaval's VMS Customer Assurance Program (the "CAP Agreement"). (ECF No. 56-3, PageID.1770-88).  The CAP Agreement required Hardy to buy specified "DeLaval brand consumable products" in exchange for DeLaval's extended warranty on the milking machines purchased under the Sales Agreement. (ECF No. 56-2, PageID.1689, ¶ 5; ECF No. 56-3, PageID.1773, 1781-83, 1788).

According to DeLaval, Hardy owes the following amounts under the CAP Agreement:

- $137,379.57 for "goods and services" tendered prior to the initiation of this lawsuit; and

- $12,704.46, representing the remaining payment on a settlement with Hardy for unpaid "goods and services provided."

(ECF No. 56-2, PageID.1690, ¶ 11).

### B.   Procedural History

DeLaval commenced this lawsuit in November 2020. (ECF No. 1).  The first amended complaint alleges causes of action for (1) breach of the Sales Agreement (Count I), (2) breach of the CAP Agreement (Count II), and (3) a claim for "goods sold and received" (Count III).[2] (ECF No. 5, PageID.37-40).  Hardy responded that DeLaval breached the Sales Agreement "from the inception and has failed to install working equipment in accordance with the contract." (ECF No. 7, PageID.65, ¶ 8; *see also* ¶ 6).  And it asserted an affirmative defense of prior substantial breach. (*Id.*, PageID.68, ¶ 3).  The parties now cross-move for summary judgment. (ECF Nos. 56-57).

---

[2] DeLaval asserts a claim for post-lawsuit damages for the first time in its cross-motion for summary judgment. (ECF No. 56, PageID.1682; ECF No. 56-2, PageID.1691, ¶ 11d.).  The Court will dismiss this claim for the reasons discussed in sub-section IV.D to this opinion and order.

III.  <u>Legal Standards</u>

A moving party is entitled to summary judgment where the "materials in the record" do not establish the presence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c).  All the evidence, along with all reasonable inferences, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

IV.  <u>Analysis</u>

   *A.    Breach of the Sales Agreement (Count I)*

DeLaval contends that Hardy breached the Sales Agreement when it failed to make the last $187,950 payment due under the Third Amendment. (ECF No. 56-2, PageID.1690, ¶ 11a.).  Paragraph 2 to the Third Amendment reads in its entirety:

> Payment of $187,950 shall be made upon the setting of the last two DeLaval V300 milking robots and $187,950 shall be paid within seven (7) days upon the same being installed, commissioned ***and operating (milk and wash) to industry standards ("Performance Standard").  Upon successful commissioning, in the event Hardy's disputes that the Performance Standard has been met, DeLaval shall schedule an independent inspection by a member of its North American VMS Technical Team.***  Such inspection shall be scheduled as soon as possible.  ***The VMS Technical Team shall*** repair or replace any defective equipment, or make any other corrections needed, until it is able to ***certify that the Performance Standard has been met.  Upon certification that the Performance Standard has been met, Buyer shall pay the last remaining amount owed within five days.***

(ECF No. 5-5, PageID.54) (emphasis added).  The claim falters on two grounds.

To begin with, DeLaval marshals no evidence that the last two V300s operated to the "Performance Standard" upon installation.  DeLaval personnel, including AMS System Specialist Chris Horton and VMS Technician Ryan Weis, inspected the machines on February 11, 2020 after their installation and "setup" the previous December. (ECF No. 57, PageID.1879-80; ECF No. 61-1, PageID.2610, ¶ 7).  The inspection "primarily . . . follow[ed] the requirements of DeLaval's current V300 Dealer Installation and Startup Manuals." (*Id.*, PageID.1879).  DeLaval personnel further consulted "additional requirements and inspection points" based upon their "experience and knowledge of the DeLaval, V300, Milk Transport, and Milk House requirement[s]." (*Id.*).

Their subsequent "Installation & Setup Inspection" report, however, omits any reference to inspecting the V300s during their operation or assessing whether the machines operated according to "industry standards" or the "Performance Standard." (*Id.*, PageID.1879-80; PageID.2049, Tr. 304:15-18).  While DeLaval personnel observed some minor anomalies, they speculated whether "any of these *would compromise* the function of the system as a whole" – in other words, they never inspected the V300s' overall functionality. (*Id.*, PageID.1880) (emphasis added).  Nor does the "Installation & Setup Inspection" report evaluate whether the V300s operated in conformance with the United States Public Health Service's "Grade A" Pasteurized Milk Ordinance (the "PMO") – the industry standard for milk

sanitation.[3] (ECF No. 57, PageID.2047, Tr. 295:23-296:10; *see also* PageID.1940) (stating that "[t]he Grade 'A' PMO is . . . recognized by the Public Health Agencies, the milk industry, and many others as the national standard for milk sanitation.").

The unrebutted evidence instead shows that the V300s do not operate according to PMO standards. Gregg Hardy, the dairy's sole member, testified that (1) the V300s wash each cow teat with a sanitizing solution and dry them prior to milking at a rate "well under 80 percent" (*Id.*, PageID.2178, ¶ 1; PageID.2051, Tr. 311:13-14), (2) they are "very deficient" when clearing debris, such as manure, from the milking platform (*Id.*, PageID.2048, Tr. 299:15-21), and (3) they fail to wash teat cups and milking cup liners that fall into contaminants on the milking station floor before reattaching them. (*Id.*; PageID.2048, Tr. 300:10-301:17). All these defects violate the PMO. (*Id.*, PageID.1947-48, 1961-62, Items 3r., 13r.-14r.).

DeLaval's own investigation into the V300s' performance bolsters this conclusion. On October 7, 2020, DeLaval's Dairy Advisory Manager, Kristy Campbell, authored a Dairy Advisory Report after she performed an onsite inspection at Hardy's dairy farm in May 2020. (ECF No. 57, PageID.1884-1936). Campbell found that 8 out of 32 newly installed jetter seals (which are needed to close the V300s for washing) became dislodged within two days after their installation. (*Id.*, PageID.1890). She noted that "[o]ther V300 barns have reported

---

[3] DeLaval does not contest this assertion.

experiencing similar problems." (*Id.*).  And Gregg Hardy testified that although jetter seal dislodgment often results in milk contamination, DeLaval never corrected the problem in the V300s installed at the dairy. (*Id.*, PageID.2050-51, Tr. 307:16-20, Tr. 310:3-17).

Still, even assuming the last two V300s operated to the "Performance Standard" upon their installation, no one disputes that Hardy's contested this very point – triggering DeLaval's obligation to "schedule an independent inspection by a member of its North American VMS Technical Team . . . as soon as possible." (ECF No. 5-5, PageID.54).

On February 20, 2020, Gregg Hardy emailed William LaBean, the Commercial Manager for DeLaval's Michigan-based dealership, stating that a previous email from LaBean:

> impli[ed] . . . that we are the ones that are supposed to be responsible to figure out why YOUR system ***does not operate up to Industry Standards*** – it is not our responsibility.  It would be a completely different issue had the sale and installation of the equipment been completed and an Industry level of performance been achieved and then we let that level of performance dissipate through our negligence or improper operation.  ***Problem is DeLaval never achieved the first threshold demonstrating the system is capable of performing*** . . .

(ECF No. 57, PageID.2181) (emphasis added).

But in response to Hardy's complaints, DeLaval never fulfilled its contractual obligation to (1) "schedule an independent inspection by a member of its North

American VMS Technical Team," (2) schedule the inspection "as soon as possible," and (3) dispatch a VMS Technical Team member to "certify that the Performance Standard has been met." (ECF No. 5-5, PageID.54; ECF No. 57, PageID.2014-15, Tr. 165:21-166:6; PageID.2049, Tr. 304:15-18; PageID.2146, Tr. 90:4-13).  Since DeLaval failed to initiate or complete the mandated inspection procedures, Hardy incurred no concomitant responsibility to make the last $187,950 payment. (ECF No. 5-5, PageID.54).

DeLaval disagrees with this conclusion for a bevy of reasons.  Looking first to Missouri's version of the Uniform Commercial Code, DeLaval argues that Hardy accepted the last two V300s and must pay for them because the dairy failed to effectively reject them (or revoke its acceptance of the units) within a reasonable time after their installation.[4] (ECF No. 59, PageID.2210-15) (citing Mo. Ann. Stat. §§ 400.2-602, 606, 607, 709).

Aside from certain exceptions, Missouri's UCC authorizes parties transacting in the sale of goods to supplant the statute's default provisions with their own contractual terms. Mo. Ann. Stat. § 400.1-302(a); *see also GE Capital Corp. v. Rauch*, 970 S.W.2d 348, 352 (Mo. Ct. App. S.D. 1998); *Central Prod. Credit Assoc. v. Hopkins*, 810 S.W.2d 108, 114 (Mo. Ct. App. S.D. 1991) (stating that "[t]he

---

[4] The parties agree that Missouri law governs the disposition of Count I in accordance with the Sale Agreement's choice-of-law clause. (ECF No. 5-5, PageID.45, ¶ 9).

provisions of the Uniform Commercial Code may be varied by agreement"). That's exactly what the parties did when they amended the Sales Agreement's payment terms. Because the Third Amendment conditioned Hardy's payment on DeLaval's "independent inspection" and "certification" that the V300s met the "Performance Standard," those terms govern the parties' obligations, not the UCC's generic scheme for the acceptance and rejection of goods.

Next, DeLaval maintains that the "two-dismissal" rule precludes Hardy from raising "prior breach" as an affirmative defense to its non-payment. (ECF No. 56, PageID.1673-75). The two-dismissal rule stems from Federal Rule of Civil Procedure 41(a)(1). That rule allows plaintiffs to "dismiss an action without a court order" through filing a notice of dismissal, so long as the defendant has not served "either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A)(i). The dismissal notice "operates as an adjudication on the merits" if the plaintiff "previously dismissed any federal or state-court action based on or including the same claim." Fed. R. Civ. P. 41(a)(1)(B); *see also* 9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure, § 2368 (4th ed. Apr. 2023 Update).

DeLaval invokes the two-dismissal rule because Hardy voluntarily dismissed a Michigan state district court case and a subsequent federal case (transferred to this district from the Western District of Missouri) that purportedly asserted claims

mirroring the prior breach affirmative defense that Hardy invokes here.  The two-dismissal rule, though, does not appear to preclude the assertion of affirmative defenses that are related to previously dismissed claims.  And if it does, then DeLaval should have referenced the authorities endorsing that position because the Court could not locate any.

But even if the two-dismissal rule encompasses affirmative defenses, DeLaval still fails to carry its burden of showing – either through pleadings or other court documents – that Hardy's causes of action in the Michigan state court case are related to the prior breach defense in this one. *See* 9 Wright & Miller, *Federal Practice & Procedure*, § 2368 (4th ed. Apr. 2023 Update) ("The party seeking to invoke the two dismissal rule bears the burden of proving its applicability by a preponderance of the evidence."); *see also Marques v. Federal Reserve Bank of Chicago*, 286 F.3d 1014, 1017 (7th Cir. 2002).

And supposing the Court were to strike Hardy's prior breach affirmative defense altogether, the burden would still rest with DeLaval to establish that it met all the conditions precedent to triggering Hardy's obligation to pay the remaining $187,950. *See, e.g., Kan. City Live Block 125 Retail, LLC v. Bhakta*, 476 S.W.3d 326, 332 (Mo. Ct. App. W.D. 2015) (stating that "a condition precedent is an act or event that must be performed or occur, after the contract has been formed, before the contract becomes effective.") (cleaned up).  DeLaval's proof falls short of this mark.

11

Lastly, DeLaval claims that the Sales Agreement's integration clause bars Hardy from asserting prior breach since that affirmative defense is "based upon representations allegedly made to Gregg Hardy prior to the date he signed the Sales Agreement on behalf of Hardy." (ECF No. 56, PageID.1676).   DeLaval misconceives the affirmative defense's basic premise.   Hardy solely challenges whether DeLaval adhered to the conditions precedent in paragraph 2 to the Third Amendment.   Any representations beyond the four corners of that contractual text are immaterial to the prior breach defense.   So the integration clause has no bearing on this dispute. (ECF No. 60, PageID.2250-51).

Because a jury could not reasonably decide that (1) the V300s operated to the "Performance Standard" after their installation, or in the alternative, that (2) DeLaval dispatched a VMS Technical Team member to "certify" whether the units met the "Performance Standard" after receiving Hardy's complaints, DeLaval never fulfilled the conditions precedent to earning the last $187,950 payment.  Hardy is, therefore, entitled to summary judgment on the sales agreement claim.

B.    *Breach of the CAP Agreement (Count II)*

DeLaval's contention that Hardy breached of the CAP agreement rests largely upon LaBean's declaration and an invoice spreadsheet summary appended to the

first amended complaint.[5] (ECF No. 56, PageID.1681-82). Neither document adequately supports DeLaval's motion for summary judgment.

Declarations "used to support" summary judgment motions "must be made on personal knowledge" and "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). Declarations containing "only conclusory allegations" are insufficient to carry the moving party's burden to show the absence of any genuine factual questions. *Sigmon v. Appalachian Coal Props.*, 400 F. App'x 43, 48-49 (6th Cir. 2010); *see also* Fed. R. Civ. P. 56(a); 10B Wright & Miller, Federal Practice & Procedure, § 2738 (4th ed. Apr. 2023 Update) (stating that "ultimate or conclusory facts . . . cannot be utilized on a summary-judgment motion.").

LaBean attests in his declaration that:

> 3.     Since September 2018, I have been employed as the Commercial Manager of DeLaval Dairy Service – Michigan, the wholly owned DeLaval Inc. dealer in Michigan ("DeLaval").
>
> 4.     In the course of my employment for DeLaval, I have been responsible for managing the DeLaval business that provided parts, service, and consumable goods to Defendant Hardy's Holsteins, LLC ("Hardy").

---

[5] The parties agree that Michigan law governs the disposition of Count II in accordance with the CAP Agreement's choice-of-law clause. (ECF No. 56-3, PageID.1777-78, ¶ 10). There is no reason to consult state substantive law, however, because the claim fails to comport with federal evidentiary and civil rules. *See Back v. Nestlé USA, Inc.*, 694 F.3d 571, 576-77 (6th Cir. 2012) ("In diversity cases, evidence admissibility is governed by the Federal Rules of Evidence."); *Bowling v. Wal-Mart Stores, Inc.*, 233 F. App'x 460, 463 (6th Cir. 2007) (stating that the Federal Rules of Civil Procedure govern in diversity cases).

5.      On June 1, 2018, in conjunction with the equipment sales agreement, DeLaval and Hardy entered into the VMS™ Customer Assurance Program ("CAP") contract (the "CAP Agreement"). Pursuant to the CAP Agreement, DeLaval provided certain goods and services to Hardy as part of an extended warranty program for the robotic milking systems sold to Hardy under the equipment sales agreement.

6.      The CAP Agreement indicates on the first page that DeLaval Dairy Service in Lansing, Michigan will be the DeLaval dealer providing goods and services to Hardy.

(. . .)

9.      Prior to the commencement of this lawsuit, Hardy failed to pay numerous invoices for goods and services that were provided to it by DeLaval. Attached to the Complaint as Exhibit 5 was a spreadsheet listing those invoices which totaled $137,379.57.

(ECF No. 56-2, PageID.1688-90, ¶¶ 3-6, 9).  Taken together, these statements are not detailed enough to award summary judgment in DeLaval's favor.

LaBean's declaration adds nothing more than what can already be gleaned from the first amended complaint: that Hardy refused to pay invoices in the amount of $137,379.57 for goods and services that DeLaval tendered under the CAP Agreement.  And the declaration omits critical information, such as (1) how LaBean identified the unpaid invoices, (2) the methodology he employed to verify the amounts invoiced, and (3) whether he accounted for any offsetting payments from Hardy, *e.g.*, the $12,704.46 that DeLaval acknowledged receiving from Hardy in July 2020. (ECF No. 56, PageID.1682; ECF No. 56-2, PageID.1689-90, ¶¶ 8, 11b.).

The spreadsheet attached to the first amended complaint, which purportedly summarizes the unpaid invoices, does not remedy the deficiencies in LaBean's declaration.  Fed. R. Evid. 1006 allows a "proponent" to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."   Evidentiary summaries are admissible under Rule 1006 so long as five prerequisites are satisfied: (1) the underlying documents must be so voluminous that they cannot be conveniently examined in court, (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place, (3) the underlying documents must be admissible in evidence, (4) the summary must be accurate and nonprejudicial, and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation. *United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002); *United States v. Bray*, 139 F.3d 1104, 1109-10 (6th Cir. 1998); *see also DSSDR, LLC v. Zenith Infotech, LTD*, No. 13-10026, 2014 U.S. Dist. LEXIS 48232, at *9-12 (D. Mass. Apr. 8, 2014) (employing Rule 1006 to consider "Excel spreadsheets . . . based on invoices from Zenith's general ledger" to award summary judgment on an actual damages claim).

Presuming the first four elements are satisfied (and they appear to be), DeLaval fails to introduce the spreadsheet summary through the testimony of a witness who either prepared it or supervised its preparation, *i.e.*, the fifth prong.

15

LaBean's declaration is silent about the spreadsheet's authorship and DeLaval otherwise neglects to submit the affidavit or declaration of its creators, let alone, identify who they are.

Since LaBean's declaration is conclusory, and the invoice spreadsheet is inadmissible, DeLaval is left with no other remaining evidence sufficient to prevail on summary judgment.

Yet, Hardy's cross-motion fairs no better.   Apart from raising alleged discovery violations,[6] Hardy offers no affirmative proof that it paid the outstanding invoices, that a legitimate reason exists for withholding payment, or that the invoices suffer from some form of fatal evidentiary defect.  And without this showing, Hardy cannot establish the absence of a genuine factual dispute necessary to obtain summary judgment.  Whether DeLaval is entitled to relief on its claim for breach of the CAP agreement is, therefore, a question that a jury must ultimately decide.

> C.    *Claim for Goods Sold and Received (Count III)*

DeLaval's cause of action for "goods sold and received" is more straightforward.  Although the parties leave the substantive contours of this claim undefined, the Court construes it as an account stated action under Michigan law since that cause of action appears to supply the appropriate framework. *See, e.g.,*

---

[6] The Court will address these objections in sub-section IV.C to this opinion and order.

*Scarff Bros. v. Bischer Farms*, 386 F. App'x 518, 520 (6th Cir. 2010) ("When sitting in diversity, a federal district court applies the substantive law of the state in which it sits and federal procedural law.").

An "account stated" refers to a "contract based on assent to an agreed balance, and it is an evidentiary admission by the parties of the facts asserted in the computation and of the promise by the debtor to pay the amount due." *Fisher Sand & Gravel Co. v. Neal A. Sweebe, Inc.*, 494 Mich. 543, 557 (2013) (quotation omitted). "When the parties expressly agree to the sum due, the stated account forms an express contract." *Id.* at 558. The "parties assent to a sum as the correct balance due from one to the other; and whether this operation has been performed or not, in any instance, must depend upon the facts." *Dunn v. Bennett*, 303 Mich. App. 767, 771 (2014) (quotation omitted).

In a July 22, 2020 email to LaBean, Parker Hardy, the dairy's general manager, wrote:

> Bill,
>
> I have approved per our conversation $25,408.92 worth of the total amount due to be paid. I have to line the payment up with 2 milk checks so I am sending $12,704.46 today or at the latest tomorrow and the other half at the beginning of next month when we have another milk check.
>
> This payment needs to be applied only to the oldest invoices for service kits, spare parts, iodine, and extract chlorine.

(ECF No. 56-2, PageID.1693).

17

Through LaBean's declaration, DeLaval asserts that Hardy never paid the second $12,704.46 installment. (*Id.*, PageID.1689, ¶ 8). And Hardy fails to counter LaBean's declaration with admissible proof of payment or a legitimate basis for neglecting to remit the stated amount. Fed. R. Civ. P. 56(c)(1)(A); *see also* 10A Wright & Miller, Federal Practice & Procedure, §2727.2 (4th ed. Apr. 2023 Update).

Instead, Hardy attacks the admissibility of LaBean's declaration on discovery-related grounds, arguing that Fed. R. Civ. P. 37(c)(1) bars DeLaval from proffering LaBean's declaration because it never served initial disclosures identifying him as a potential witness. (ECF No. 60, PageID.2247); *see* Fed. R. Civ. P. 26(a)(1).

DeLaval's nondisclosure is "harmless." Fed. R. Civ. P. 37(c)(1). Hardy already knew that LaBean could potentially testify about relevant information since it identified him as a prospective witness in response to DeLaval's interrogatories. (ECF No. 57, PageID.1860-61). And, in any event, the Court declines to strike LaBean's declaration because Hardy never moved to compel DeLaval to serve its initial disclosures during discovery. *See FCA US LLC v. Bullock*, 446 F. Supp. 3d 201, 217 (E.D. Mich. 2020) (declining to strike a claim for damages where the moving party "fail[ed] to file a timely motion to compel during the discovery

18

phase."); *see also United States v. Stinson*, No. 14-1534, 2016 U.S. Dist. LEXIS 185771, at *13-15 (M.D. Fla. Nov. 22, 2016) (collecting cases).[7]

Because there is no genuine factual dispute as to Hardy's non-payment, summary judgment is awarded to DeLaval on the "goods sold and received" claim in the amount of $12,704.46.

### D.    Post-Lawsuit Damages

Finally, DeLaval seeks post-lawsuit damages amounting to $44,094.86 for unpaid "parts, services, and consumables" delivered to Hardy "between March 15, 2021 and February 22, 2022." (ECF No. 56-2, PageID.1691). This request for relief comes too late.

Plaintiffs cannot typically recover damages that they fail to allege in the operative pleading. *See Mena v. McArthur Dairy*, 352 F. App'x 303, 309 (11th Cir. 2009) (affirming dismissal of wage and hour claims because the "complaint never mentioned straight time pay and only contained a conclusory allegation as to the minimum wage violation."); *Schneider v. United States Postal Serv.*, No. 16-0013, 2022 U.S. Dist. LEXIS 15622, at *35 (E.D. Wis. Jan. 28, 2022) (holding that

---

[7] Hardy's insistence that the Court preclude DeLaval from proffering evidence about its monetary damages because DeLaval failed to provide damages-related initial disclosures is unpersuasive for this same reason. (ECF No. 60, PageID.2247); *see Bullock*, 446 F. Supp. 3d at 217.

plaintiff's failure to plead special damages could not be remedied "in a last-minute amendment through his briefing" on summary judgment).

Here, neither the initial complaint nor the amended complaint mentions post-lawsuit damages. (ECF Nos. 1, 5).  DeLaval moved for summary judgment on December 19, 2022 – nearly 10 months after it provided Hardy with the last shipment of "parts, services, and consumables." (ECF No. 56).  In the interim, DeLaval never sought leave to amend or supplement its pleadings to include a claim for post-lawsuit damages.  Since a party cannot amend its operative pleading for the first time on summary judgment to include on an unpled claim, DeLaval's request for post-lawsuit damages must be dismissed. *Cf. Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788-89 (6th Cir. 2005) (affirming the district court's refusal to entertain a new claim raised for the first time in opposition to summary judgment because the plaintiff could have amended the complaint); *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (same).

Accordingly,

IT IS ORDERED that DeLaval's cross-motion for summary judgment (ECF No. 56) on Count III is granted.

IT IS FURTHER ORDERED that Hardy's cross-motion for summary judgment (ECF No. 57) on Count I and the claim for post-lawsuit damages is granted.

IT IS FURTHER ORDERED that the parties cross-motions for summary judgment on Count II, and in all other respects, are denied.

**IT IS SO ORDERED.**

                                                    s/Bernard A. Friedman
Dated: September 29, 2023          Bernard A. Friedman
         Detroit, Michigan              Senior United States District Judge

21